1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA GUTIERREZ,<br><br>Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, acting<br>Commissioner of Social Security,<br><br>Defendant. | No. 1:21-cv-00181-ADA-GSA<br><br>**FINDINGS AND RECOMMENDATIONS TO DIRECT ENTRY OF JUDGMENT IN FAVOR PLAINTIFF AND AGAINST DEFENDANT COMMISSIONER OF SOCIAL SECURITY**<br><br>**(Doc. 20)**<br><br>**OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN (14) DAYS** |

## I.      Introduction

Plaintiff Patricia Gutierrez appeals a decision of the Commissioner of Social Security denying her application for social security disability insurance benefits under Title II of the Social Security Act.  For the reasons stated below, substantial evidence and applicable law do not support the ALJ's decision that Plaintiff was not disabled.  Accordingly, the recommendation is that judgment issue for Plaintiff, reversing the Commissioner's decision and remanding for additional proceedings.

## II.      Factual and Procedural Background

On February 9, 2018, Plaintiff applied for disability insurance benefits alleging a disability onset date of September 14, 2017.  The Commissioner denied the application initially on April 13, 2018, and on reconsideration on November 13, 2018.  The Administrative Law Judge (the "ALJ") held a hearing on April 10, 2020.  AR 44–69.  On September 8, 2020, the ALJ issued an unfavorable decision.  AR 17–43.  The Appeals Council denied review on December 10, 2020.  AR 6–11.

## III.      The Disability Standard

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal

error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).   Substantial evidence is evidence that a reasonable mind would accept to support a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).   It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted).   If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).   "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. § 1382c(a)(3)(A).   An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.   20 C.F.R. §§ 416.920(a)-(f).   The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.   20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically

equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f). While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience. *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

## IV.   The ALJ's Decision

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of September 14, 2017. AR 24. At step two the ALJ found that Plaintiff had the following severe impairments: arthritis, obesity, fibromyalgia, carpal tunnel syndrome, and diabetes mellitus with neuropathy. AR 24. The ALJ also determined at step two that Plaintiff had the following non-severe impairments: sleep apnea and asthma. AR 24. At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 25.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) with occasional climbing, frequent manipulative activities bilaterally, cane use for walking more than one block, and environmental restrictions not at issue (pulmonary irritants and extreme cold exposure). AR 24–28.

At step four the ALJ concluded that Plaintiff could perform her past relevant work as a teacher aide. AR 34. Accordingly, the ALJ concluded that Plaintiff was not disabled at any time between her alleged disability onset date of September 14, 2017 through the date of the ALJ's decision. AR 37.

### V.   Issues Presented

Plaintiff asserts two claims of error: 1) the ALJ erred in relying on outdated medical opinions and his own lay interpretation of the medical data; 2) the ALJ erred by failing to set forth specific, legitimate reasons for rejecting the opinions from treating and examining sources.. Br. at 1, Doc. 24.

### A.   Failure to Develop the Record

#### 1.   Applicable Law

The ALJ's duty to further develop the record is triggered where the evidence is ambiguous or inadequate to allow for proper evaluation.  *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001); *Tonapetyan*, 242 F.3d at 1150.  A specific finding of ambiguity or inadequacy in the record is not required to trigger the necessity to further develop the record where the record itself establishes the ambiguity or inadequacy.  *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011); *Garcia v. Comm'r of Soc. Sec.*, No. 1:19-CV-00545-SAB, 2020 WL 1904826, at *13 (E.D. Cal. Apr. 17, 2020).

#### 2.   Analysis

Plaintiff contends that the ALJ pointed to no evidence from a treating or an examining medical professional to support the RFC assessment, which renders the RFC unsupported.  Br. at 11.  This is refuted by the regulations which state that the RFC need not mirror a particular opinion; it is an assessment formulated by the ALJ based on all relevant evidence.  *See* 20 C.F.R. §§ 404.1545(a)(3).

Plaintiff argues the ALJ was unqualified to interpret medical data and translate it in functional terms which the ALJ necessarily did by independently reviewing the medical evidence post-dating the non-examining physician's opinions.  The argument is also unpersuasive in that there is always a gap in time between the prior administrative decisions and the ALJ decision, and claimants routinely continue treatment during that time generating new medical evidence.

4

Although ALJs do not have unbridled discretion to do so,[1] an ALJ is almost always tasked with performing some independent review of medical evidence that was never considered by one of the agency's reviewing physicians and translating the same into an RFC.  This is consistent with the ALJ's role as characterized by the Ninth Circuit.  *See Rounds v. Comm'r of Soc. Sec.*, 807 F.3d 996, 1006 (9th Cir. 2015), ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC.").

Plaintiff emphasizes that the agency level non-examining consultant, Dr. Khong, only reviewed evidence concerning impairments of obesity, diabetes mellitus, arthritis, and fibromyalgia (AR. 77, 92), whereas other records concerning carpal tunnel were generated thereafter, including: **1)** on November 27, 2018, Plaintiff demonstrated decreased feeling in her hands-- right greater than left, decreased strength and grip in the right hand, numbness and tingling of the bilateral hands and upper extremities, and impaired sleep due to pain (AR 635–36); **2)** on December 6, 2018, Plaintiff continued to have significant pain, numbness and tingling of the right upper extremity and very tender neck with significant irritation throughout the median, ulnar and radial nerves from carpal tunnel into the hand. (AR 631); and **3)** she was sensitive to very light palpation of the neck throughout the right upper extremity. (AR 632).

However, Dr. Khong did review records concerning carpal tunnel, including the release surgery, and post-operative records noting ability to flex and extend all digits, decreased right hand

---

[1] While there are no bright lines circumscribing the ALJ's authority to independently interpret medical evidence, some courts have found that an ALJ errs in independently reviewing medical evidence when it involves: 1) review of raw medical data such as complex imaging findings or laboratory testing results, 2) worsening of underlying impairments, or 3) development of novel impairments.  *See, e.g., Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (ALJ formulated claimant's residual functional capacity based on magnetic resonance images without the benefit of any medical opinion about the functional limitations attributable to the impairments depicted in the images); *Goodman v. Berryhill*, No. 2:17-CV-01228 CKD, 2019  WL 79016, at *5 (E.D. Cal. Jan. 2, 2019) (finding that the ALJ erred in adopting state agency consultants' opinions which were rendered before "plaintiff sustained a fall in November 2014" and before "an April 2015 MRI of the lumbar spine [which] showed L1 compression deformity with worsened kyphosis . . ."); *Stevenson v. Colvin*, No. 2:15-CV-0463-CKD, 2015 WL 6502198, at *4 (E.D. Cal. Oct. 27, 2015) (holding that the ALJ erred in adopting the functionality opinion of a non-examining state agency physician, an opinion which pre-dated "plaintiff's treating records regarding the progression of his spinal impairments, which were developed after the date of Dr. Pancho's opinion.").

tingling sensation and no gross abnormalities with the right hand, among others.  AR 90–91.  Further, the ALJ did obtain a consultative examination and associated opinion (Dr. Stoltz), which is the remedy Plaintiff alluded to at various junctures emphasizing the importance of an in-person examination.

**B.      Rejection of the Examining Opinions**

**1.      Applicable Law**

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity.  *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."  *Robbins,* 466 F.3d at 883.  *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings."  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

For applications filed on or after March 27, 2017, the new regulations eliminate a hierarchy of medical opinions, and provide that "[w]e will not defer or give any specific evidentiary weight,

including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, when evaluating any medical opinion, the regulations provide that the ALJ will consider the factors of supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the two most important factors and the agency will articulate how the factors of supportability and consistency are considered. *Id.*

On April 22, 2022, the Ninth Circuit addressed whether the specific and legitimate reasoning standard is consistent with the revised regulations, stating as follows:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant. See 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ..., including those from your medical sources."). Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, see Murray, 722 F.2d at 501–02, is likewise incompatible with the revised regulations. Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022)

### 2. <u>Analysis</u>

On October 6, 2018, Dr. Stoltz conducted a consultative physical examination of Plaintiff at the request of the agency. AR 569. Dr. Stoltz opined Plaintiff could: sit without restriction; stand and walk 6 of 8 hours without assisted devices; lift and carry 10 pounds occasionally; perform postural activities occasionally; and (as to manipulative limitations) "the claimant can do most activities with both her hands, arms and shoulders on an occasional basis." AR 574.

Plaintiff's treating source, PA-C Hobbs, completed a Physical Medical Source Statement dated July 18, 2018. AR 592–95. PA-C Hobbs identified diagnoses of diabetes, rheumatoid arthritis, and hypertension. AR 592. PA-C Hobbs identified the following clinical findings and

objective signs: tender joints.  PA-C Hobbs opined in relevant part that Plaintiff could: **1**) sit 15 consecutive minutes; **2**) stand/walk 10 minutes at a time and 1 hour a day; **3**)  required a sit stand option; **4**) needed periods of leg elevation; **5**) required an assistive device; **6**) could lift less than 10 pounds; and **7**) that Plaintiff had limitations as to: a) twisting objects (10-15% of an 8-hour day); b) manipulative activities (10-15%); c) reaching in front of body (20%); and, d) overhead reaching (15%).  AR 592–95.

Plaintiff takes issue with the ALJ's analytical approach, contending the ALJ did little more than summarize conflicting clinical findings and assert that "the totality of the evidence received at the hearing level is consistent with greater functional capacity," but without specifying which portions of the doctors' opinions were unsupported or why.  Br. at 14.  Defendant in response takes issue with Plaintiff applying a defunct "specific and legitimate reasoning" standard following the regulatory revisions and elimination of the treating physician rule,[2] and contends that the ALJ's decision was sufficiently grounded in the required regulatory factors of consistency and supportability.

The ALJ provided one lengthy paragraph of findings about the medical evidence, a paragraph which was reiterated four times in: **1**) finding Plaintiff's subjective complaints not entirely supported by or consistent with the record; **2**) in making the same finding with respect to Dr. Stoltz's opinion; **3**) in making the same finding with respect to PA-C Hobbs' opinion; and, **4**) in making the opposite finding as to the state agency consultant's opinions which the ALJ found generally supported.  The paragraph in question states as follows:

> On examination, the claimant had a normal gait (Exhibit 1F at 10; Exhibit 3F at 4, 7; Exhibit 4F at 50; Exhibit 10F at 9, 15; Exhibit 23F at 8, 35; Exhibit 25F at 3). Other records indicate an antalgic gait with the use of a walker (Exhibit 4F at 14;

---

[2] Plaintiffs' brief was filed on March 15, 2022.  Doc 20.  On April 22, 2022, the Ninth Circuit clarified in *Woods* that the judicially created "specific and legitimate reasoning standard" was inconsistent with the March 27, 2017 revised regulations. *Woods*, 32 F.4th at 792.  Thus, Plaintiff's use of that language was not inconsistent with the prevailing law at the time of her opening brief.

Exhibit 6F at 48). Other records indicate an antalgic gait, but no use of an assistive device (Exhibit 6F at 37). A consultative examiner indicated that the claimant's gait was slightly slow, but with no focal or asymmetrical findings (Exhibit 9F at 6). The claimant had normal (5/5) strength (Exhibit 2F at 7, 9, 11, 13, 15; Exhibit 4F at 14, 50; Exhibit 6F at 37, 48; Exhibit 9F at 6; Exhibit 23F at 8, 13; Exhibit 31F at 4). However, at times, she was noted to have some mild decreased grip strength bilaterally (Exhibit 9F at 5). Other records indicate significant bilateral upper extremity weakness (Exhibit 13F at 37). Her sensation was intact (Exhibit 2F at 8, 10, 12, 14, 16; Exhibit 9F at 6; Exhibit 10F at 10, 15; Exhibit 25F at 4; Exhibit 27F at 2, 5). Other records indicate some decreased sensation (Exhibit 10F at 9). She had normal deep tendon reflexes (Exhibit 1F at 10; Exhibit 2F at 6, 8, 10, 12, 14, 16, 18, 20, 22; Exhibit 9F at 6; Exhibit 10F at 9, 14; Exhibit 13F at 20, 38; Exhibit 25F at 3). At times, she was noted to have decreased and painful range of motion (Exhibit 1F at 10; Exhibit 4F at 60; Exhibit 6F at 33; Exhibit 13F at 19, 37; Exhibit 23F at 8, 13). Other records indicate good range of motion (Exhibit 9F at 6; Exhibit 10F at 10, 15). She was noted to have chronic synovitis of the bilateral wrists, the MCP, PIP and DIP joints, hands, ankle joints, feet, and toes (E.g., Exhibit 4F at 14). The claimant had herbedens/bouchard's nodes on the IP joints of the fingers (Exhibit 4F at 14).

First, the ALJ found that claimant often had a normal gait (Exhibit 1F at 10; Exhibit 3F at 4, 7; Exhibit 4F at 50; Exhibit 10F at 9, 15; Exhibit 23F at 8, 35; Exhibit 25F at 3).  A review of the cited records reveals the following:

- 1F at 10 (AR 390): This is a blank page that reads in all caps and bold typeface: "this page has been removed, because it belongs to another claimant."
- 3F at 4 (AR 423): 9/19/2017 examination at the Cardiac Institute to address chief complaints of chest pain and shortness of breath. Normal gait was documented under "M/S" (musculoskeletal), the only other musculoskeletal finding being "overall – no deformity." By contrast, fairly detailed findings were documented as to respiratory, cardiac, and vascular, consistent with the purpose of the visit.
- Ex 3F at 7 (AR 426): 12/8/2017 cardiology return office visit reflecting the same findings noted above.
- 4F at 50 (AR 482): 9/20/2017 rheumatology follow up visit for arthritis management noting normal gait among other detailed musculoskeletal findings The provider also noted decreased range of motion in the ankle joints and various other abnormalities.
- 10F at 9 (AR 583): 9/19/2018 Regional Hand Center first follow up visit status post carpal tunnel release surgery, addressing wound healing, narcotic pain medication management and also noting normal gait.
- 10F at 15 (AR 589): 10/24/2018 second (6 week) follow up status post carpal tunnel release surgery, documenting the same findings
- Exhibit 23F at 8 (AR 750): 9/12/2018 appointment with PA-C Tuite (offices of internist Pam K. Janda MD) described as a "diabetic follow up."  Plaintiff complained of blurred vision, left eye pain, redness and swelling beginning the

night before. Normal gait was noted.

- Exhibit 23F at 35 (AR 777): 8/08/2018 diabetic follow up with PA-C Hobbs noting normal gait. Physical examination findings were a carbon copy of the findings from 9/12/2018 in every respect except for left eye swelling and redness (a one-off complaint unique to the 9/12/2018 examination).[3]
- Exhibit 25F at 3 (AR 835): 9/19/2018 first follow up visit status post carpal tunnel release surgery at the Regional Hand Center. This is a duplicate of 10F at 9 (AR 583)

Perhaps with the exception of the rheumatology exam (which documented range of motion deficiency and various other abnormalities undermining the notion that it was a benign physical exam), the findings of normal gait cited by the ALJ were not representative. Moreover, they were largely recycled findings or minimal physical examinations at visits the purpose of which was not to evaluate, document, or treat gait abnormalities specifically, or systemic musculoskeletal conditions more generally. Rather, some were visits to treat unrelated chronic conditions (e.g. cardiology for hypertension), and others were for highly specific/acute conditions (carpal tunnel post-op exam to monitor wound healing). This significantly undermines the notion that a gait examination was specifically performed, much less a thorough one.

The ALJ cited the following several exhibits noting normal 5/5 strength which are described in more detail as follows:

- Ex 2F at 7, 9, 11, 13, 15 (AR 399, 401, 403, 405, 407): five podiatry exams between 2015-2016[4] noting "intact posterior tibial tendon" and 5/5 strength (ostensibly about the ankle)
- Ex 4F at 14, 50 (AR 446, 482): 12/21/2017 and 9/20/2017 RA follow up exams with Dr. Khalid noting "proximal muscle strength is normal"
- Ex 6F at 37, 48 (AR 549, 560): 2/21/2018 (same) and 12/21/2017 (duplicate of AR 446)
- Ex 9F at 6 (AR 573): 10/6/2018 consultative exam with Dr. Stoltz noting 5/5 motor strength in all extremities

---

[3] The fact that PA-C Tuite and PA-C Hobbs set forth carbon copies of the same examination findings at two separate visits one month apart suggests they did not perform two independent, comprehensive physical examinations. That conclusion is bolstered by the fact that both PA-Cs used the same idiosyncratic shorthand such as "patient has *no* straight leg *raising*" (emphasis added), ostensibly intended to convey *negative* straight leg *raise*. This suggests these PA-Cs were recycling findings from a template or a prior examination, not making new findings at each visit.

[4] These substantially preceded the alleged disability onset date of September 14, 2017, and are thus of limited relevance.

1
2

- Ex 23F at 8, 13 (AR 750, 755): 9/12/2018 and 8/8/2018 follow up exams noting 5/5 lower extremity strength)

3
4

- Ex 31F at 4 (AR 872): 5/5/2020 electrophysiology consult to address chief complaint of heart palpitations, noting "good strength bilaterally normal strength" and no extremity weakness.[5]

5
6
7

Thus, of the thirteen visits cited from these six exhibits, more than half were anomalous in one or more respect (duplicates, records outside the relevant period, findings pulled from a cardiology exam, etc).

8
9
10
11
12
13
14
15
16

The ALJ also cited numerous records for the proposition that sensation and deep tendon reflexes were intact.  Exhibit 2F at 8, 10, 12, 14, 16; Exhibit 9F at 6; Exhibit 10F at 10, 15; Exhibit 25F at 4; Exhibit 27F at 2, 5).  The first five were again podiatry records which predate the relevant period--which is apparent without the need to check the pin-citations because the index of exhibits for Exhibit 2F reflects "Progress notes, dated November 9, 2015 to December 1, 2016 from Kroeker, Roy O DPM."  Doc. 12-1 at 4.  Further, these podiatry records do not support generalized inferences concerning intact sensation and deep tendon reflexes at a systemic level as findings were largely localized to the foot and ankle.

17
18
19
20
21
22
23
24
25

Exhibits 10F at 10 and 25F at 4 are duplicates[6] of the same 9/19/2018 post-carpal tunnel release surgery exanimation at the Regional Hand Center, though that examination did note intact sensation and minimal residual neurological pain and tingling of the right hand suggesting the procedure was reasonably successful.   Importantly,  the carpal tunnel release surgery would not address nor halt the progression of RA and associated joint dysfunction and *synovitis* (as discussed in more detail below).  The RA would present independent obstacles for the use of hands and other joints of the upper extremity consistent with other examinations post-dating the September 2018

26

27
28

---

[5] Again, the context of the visit tends to undermine the implication that a comprehensive physical examination was performed, including musculoskeletal findings related to strength.

[6] The scan quality admittedly makes it a bit difficult to read the date, but the same verbatim description of the post-operative examination of the right hand should quickly put the reader on notice that it is most likely a duplicate.

release surgery, such as the November 2018 physical therapy evaluation discussed in more detail below.  A fully successful carpal tunnel release surgery does not undermine the clinicians' opinions as to occasional upper extremity use.

Exhibit 27F at 2 was a primary care visit from March 2020 for diabetes management among other things and noted intact sensation perhaps at a systemic level, which would conceivably relate to diabetic neuropathy.  However, it does not appear that systemic sensory loss was one of Plaintiff's chief complaints, nor is it apparent that such sensory loss (or lack thereof) has significant functional implications.

The ALJ also cited records indicating good range of motion (Exhibit 9F at 6; Exhibit 10F at 10, 15), which again included the consultative examination with Dr. Stolz on October 6, 2018, and the post-carpal tunnel release surgery examinations in September and October of 2018.  The ALJ also acknowledged that Plaintiff "at times" was noted to have decreased and painful range of motion, the implication being that the record could support two conclusions on that issue.  But that does not appear to be the case.  The ALJ noted seven instances of range of motion deficits and two instances of normal range, only one of which included systemic findings (the consultative exam) as opposed to the post-surgery hand examination.

The range of motion abnormalities by contrast described varied or systemic deficiencies.  *See* Exhibit 4F at 60 ("decreased range of motion *in most joints* with mild swelling") (emphasis added); Exhibit 6F at 33 (same); Exhibit 13F at 19, 37 ("very restricted ROM of *bilateral UEs* with pain") (emphasis added); Exhibit 23F at 8, 13 ("decreased range of motion lumbar area secondary to pain").  Commensurate with those findings, Plaintiff was noted to have chronic synovitis of the bilateral wrists, the MCP, PIP and DIP joints, hands, ankle joints, feet, and toes (E.g., Exhibit 4F at 14), and "herbedens/bouchard's" nodes on the IP joints of the fingers (Exhibit 4F at 14).  The ALJ acknowledged these abnormalities in passing but did not reconcile them with the ALJ's

12

findings as to range of motion.  On balance, there is not substantial support for the notion that Plaintiff had normal range of motion at a systemic level during the relevant period.

Defendant also emphasizes a few other findings the ALJ made in a section labelled "Summary of Evidence."  In that summary the ALJ first stated that "carpal tunnel release surgery appears to have been successful in minimizing pain and while the claimant may experience some residual symptoms, the RFC herein accounts for any remaining limitations."  AR 25.  The RFC for frequent manipulative activities might have accounted for the minimal residual symptoms following the release surgery in September of 2018, but again carpal tunnel was not the only condition affecting Plaintiff's wrists or her ability to perform manipulative activities.  As the ALJ acknowledged elsewhere, Plaintiff was noted to have chronic *synovitis* of various hand joints as well as Heberden's nodules. (Exhibit 4F at 14).  The same record (Exhibit 4F at 14) also noted decreased range of motion about the bilateral wrists in flexion and extension.  Again, the successful carpal tunnel release surgery was not a sufficiently substantial bases to reject the two examining doctor's opinions that Plaintiff could perform manipulative activities and other activities of the upper extremities *no more than occasionally*.

As to her RA, the ALJ found that "the claimant admitted that her symptoms of pain are moderately controlled with treatment and that she nonetheless able to perform her activities of daily living, despite these symptoms. (For example, see noted from May 14, 2019, at 16F/8; Nov. 12, 2019, at 32F/6.)".  The full quotation from the visit in question reads as follows:

> Patient is here in the office today for follow up of Rheumatoid arthritis.  She feels that the symptoms are moderately controlled with treatment.  She came in complaining of joint pain. Patient states that despite her illness, she is able to perform activities of daily living. Patient is here today for follow up of fibromyalgia. She feels that the symptoms are moderately controlled with treatment.  Last seen in Feb., comes for F/U, had severe back pain, saw PCP,  X-Ray & Toradol inj. Gaba increased.
>
> AR 708.

"Moderately controlled" symptoms is a bit non-specific, especially  so because it is contained in an introductory note and is belied by the more detailed notes on the very next page which reflect Plaintiff described severe pain of her soft tissues and severe pain of her feet.  AR 709. It is also belied by the provider's own treatment notes from the immediately preceding visit in Exhibit 16F wherein her provider states, "significant synovitis persists may need to switch biologic again," despite the introductory note for that visit likewise reflecting that the condition was moderately controlled.  AR 707.

Here,  the ALJ put undue emphasis on the provider's brief recycled introductory note under "reason for visit" stating that her symptoms were "moderately controlled," this was at the expense of a more detailed objective and subjective discussion in the provider's notes which support an entirely different inference, namely that the RA was not controlled and Plaintiff continued to suffer "severe pain," as well as "significant synovitis," despite numerous trials with biologic medications.

Further, the provider's notation that Plaintiff reported she performs her "activities of daily living" is again non-specific.  The only additional information provided was in the notes concerning plan of care where the provider noted: "Tried Flexeril but groggy, takes care of grandson."  AR 709.  These type of short-hand progress notes are ill-suited to the task of describing the nature and extent of Plaintiff's ADL.  The quoted commentary is so lacking in detail that it does not serve as substantial evidence, nor does it incrementally move the overall evidentiary needle in that direction. The agency has other ways of capturing first-hand information about the claimant's ADLs with far more accuracy, context, and detail, namely the exertional questionnaire and at the administrative hearing.

To that end, Plaintiff did complete an exertional questionnaire (Exhibit 6E), which the ALJ discussed, explaining as follows:

> Further undermining this providers assessment at 22F/1 that, for example,
> the claimant can only sit for 15 minutes at one time before needing to get up, is the

fact that the claimant admits at 6E/4 to being able to drive her own car for up to 30 to 40 minutes at a time. This self-admission is between 2 to 2½ times the duration estimated by her own provider. This provider further speculated that the claimant could only sit, stand, and walk for one hour, total, over an eight-hour period. (22F/1). However, when the claimant drives herself for 30-40 minutes to a certain location (for a medical appointment, errands, etc.), and stands, sits, or walks, or any combination thereof for 15 minutes to an hour, and then drives 30-40 minutes back home, she has again easily exceeded [sic].

The ALJ's discussion is not entirely balanced insofar as the ALJ cites the exertional questionnaire primarily to establish the areas in which it is inconsistent with PA-C Hobb's opinion, but notably does not acknowledge other consistent aspects of the questionnaire as additional affirmative evidence of Plaintiff's limitations.  Further, the inconsistency the ALJ describes above isn't particularly helpful..  As a matter of simple arithmetic, it is true that Plaintiff's self-described sitting restriction of 30-40 consecutive minutes is 2 to 2.5 times greater than the 15 minute restriction identified by PA-C Hobbs--but this is not a fatal or significantly relevant "self-admission."  The two restrictions (identified six months apart) both set forth very low sitting tolerances, and the two identified restrictions are much more consistent with each other than either restriction is with the ability to sit without limitation.

The ALJ also noted an inconsistency in PA-C Hobbs' questionnaire responses, namely that PA-C Hobbs checked "no" as to whether the claimant needed periods of walking during the day, but PA-C Hobbs nevertheless "enigmatically answers the next question" as to how frequently the claimant would need walking breaks and for how long (15 minutes and 5 minutes respectively). AR 26.  The ALJ then explains that "these types of inconsistencies in response to straightforward questions do not generate confidence in this provider's conclusions."  AR 27.  However, although PA-C Hobbs' internal inconsistency might be a valid reason to reject the identified restriction and omit it from the RFC (which the ALJ did), it does not support the ALJ's broader inference about the reliability of PA-C Hobbs' conclusions.  Nor does it justify rejecting PA-C Hobbs' opinion as to the innumerable other restrictions identified in the areas of standing/walking, lifting/carrying,

bending, stooping, reaching, grasping, handling, fingering, and feeling, among others particularly where several of these restrictions overlapped with the opinion of the independent consultative examiner.

Next, the ALJ addressed the March 13, 2018, EMG and nerve conduction study which, "other than corroborating the presence of right median nerve entrapment at the wrist which was later surgically addressed, all other upper and lower bilateral extremity tests were normal. Such underwhelming objective laboratory results do not support the severely limiting assessments by providers arguing to the contrary."  Again, this statement misses the point about the functional impact of Plaintiff's RA and fibromyalgia. Specifically, it is not clear what abnormalities the ALJ would have expected to see in the EMG/NCV results to support the assessments of the two clinicians in question (Dr. Stolz and PA-C Hobbs), other than Plaintiff's carpal tunnel syndrome as the EMG/NCV results, as mentioned above,  do not address the functional impact of Plaintiff's RA or fibromyalgia.

Next the ALJ states:

> If the claimant had been so severely limited in her daily activities (cooks, sweeps, washes dishes e.g. Ex. 6E/3, one would reasonably expect the claimant's provider to discover much less than full and normal bilateral strength throughout, including findings of weakness and atrophy in both the upper and lower extremities. This lack of corroborating evidence in a recent 2020 physical exam undermines findings and arguments to the contrary. In addition, in another 2020 examination the claimant's provider assessed her pain level at a zero out of ten (Ex. 27F/1). Likewise, such findings are not consistent with more severe and ongoing limits beyond those outlines in the RFC herein.

However, it does not necessarily follow that if person is impaired to the degree that Dr. Stolz and PA-C Hobbs' opined Plaintiff was, such person must necessarily expect to have systemic weakness and muscle atrophy.  In other words, the suggestion here is that *weakness and atrophy* are necessary conditions that someone with RA, fibromyalgia, obesity, and diabetes would have to exhibit to be unable to meet the exertional demands of light work.  But where in the record is there

support for this finding?

Further, the ALJ was not limited to only two options – to either accept or reject the opinions of Dr. Stolz and PA-C Hobbs in their entirety.  There is a reasonably broad spectrum of RFC restrictions between those identified by the two clinicians and the ALJ's assessed RFC.  Plaintiff's limitations could fall within that spectrum without ever displaying extreme physical deficiencies such as muscle atrophy.[7]  For example, one could find the opinions unsupported in one or more aspects (such as PA-C Hobbs' internal inconsistency regarding breaks from sitting), yet still find that those opinions lend additional credence to the notion that an obese 60-year old female with inadequately controlled RA and joint synovitis[8] has an exertional capacity below the requirements of light work (lifting up to 25 pounds up to 1/3 of an 8-hour day and standing/ walking 6 of 8 hours).

As to the "recent 2020 examination," the ALJ was referring to a May 5, 2020, examination which the ALJ described as follows:

> Also, on May 5, 2020, at 31F/4, her provider assessed that the claimant enjoyed full and normal bilateral strength throughout, with no weakness and no numbness. This conclusion simply does not square with the significant limits beyond the RFC applied herein and asserted by the claimant or by the claimant's provider at 22F, even taking into account the mildly reduced grip strength observed by the CE at 9FG/5, who ultimately agreed that the claimant continues to have full 5/5 strength, bilaterally, in her upper and lower extremities observed by the CE at 9FG/5, who ultimately agreed that the claimant continues to have full 5/5 strength, bilaterally, in her upper and lower extremities.

Exhibit 31F/4 is another cardiology examination to address a chief complaint of palpitations.  The notes purport to set forth results of a comprehensive physical examination, but the only findings as to musculoskeletal were "good strength bilaterally normal strength."  This limited explanation bears no resemblance to the detailed findings one would find in the context of

---

[7] And for that same reason, the isolated treatment recommendation of "walking and yoga" of unspecified nature, frequency, and duration does not necessarily suggest an able-bodied individual.

[8] As the ALJ briefly acknowledged in passing, Plaintiff failed several different biologics and has chronic synovitis of the bilateral upper and lower extremities.  AR 29

an orthopedic, neurological, or rheumatology examination which would address strength and range of motion of all major joints (usually numerically), noting the presence or absence of tenderness to palpation, redness, and swelling-- among other things.

Plaintiff's initial physical therapy examination on November 17, 2018, for example, provided precise ROM measurements for each major joint, noted significant bilateral upper extremity weakness, positive pain provocation signs, painful upper cervical ligament testing, and significant tenderness throughout bilateral upper extremities.   AR 639–41.   Here, the generalized cardiology findings of "good strength bilaterally normal strength," are not nearly as informative as the detailed findings of the physical therapist.   The purpose of the former was to evaluate and treat palpitations, while the purpose of the latter was to test comprehensive muscle and joint function.

As for "another 2020 examination [at which] the claimant's provider assessed her pain level at a zero out of ten (Ex. 27F/1)," the exhibit in question reflects two visits with a family physician, Dr. Sekhon,   for follow up management of hypertension, high cholesterol, diabetes, hyperthyroidism.  The notation of pain zero out of ten was a part of the vitals check, and importantly is not specific to any body part or condition.   Despite the notation of pain level zero under vitals check, she was assessed with chronic back pain and RA "in status quo," and was prescribed tramadol 50mg, a narcotic pain medication.  AR 846.  Further, the very next examination in that exhibit which took place three months later with the same provider similarly lists pain level zero out of ten under the vitals check findings-- yet the chief complaints for that particular visit included leg cramps and "acute pain."  AR 848.  Again, this is not an instance where the record could support more than one conclusion where deference to the ALJ's conclusion would be appropriate.   In this instance even a brief review of that six-page exhibit readily demonstrates that the notation pain zero out of ten under vitals check was not a reliable indicator of pain level.

The ALJ further stated that "there also appears to be issues with medication non-

compliance, which diminishes the persuasiveness of the claimant's allegations of disabling limitations (Exhibit 5F at 13)." AR 30. The cited record states as follows: "was out of refills again last week as she missed an appointment, stressed compliance and given her refills." AR 511. The fact that the provider "stressed compliance" does not establish medication non-compliance, nor does the fact that she missed an appointment helpful as there is no information as to reason she missed the appointment.

In sum, perhaps with the exception of Plaintiff's successful carpal tunnel surgery and a select few benign physical examinations, the evidentiary basis for the ALJ's decision was certainly not sufficiently substantial to sustain the decision, particularly in light of the opinions of the only two examining clinicians which supported a more restrictive exertional RFC. The ALJ's factual discussion at first glance appears to be quite thorough and reasonably even-handed insofar as the ALJ described normal and abnormal findings alike, juxtaposing the two. However, a more thorough and comprehensive review of the record and exhibits in this matter, as set forth in detail above, reveal that the ALJ's decision is unsupportable.

More exactly, the ALJ's errors were numerous and varied in describing the medical evidence and citing the corresponding exhibits. These errors included: **1**) citing records substantially predating the relevant period; **2**) citing findings related to one body part as if they supported systemic conclusions; **3**) citing duplicate copies of the same examination which gave the impression that the benign findings were more numerous than they actually were; **4**) citing pages that stated they were intentionally left blank because they belonged to another claimant; and **5**) citing bare bones musculoskeletal findings from visits having little or nothing to do with musculoskeletal dysfunction.

The ALJ's additional reasoning under "Summary of Evidence" was also unpersuasive and unsupported, including the emphasis on: 1) successful carpal tunnel release surgery (which would

not address joint dysfunction); **2**) an introductory comment that her RA was moderately controlled by medication, which was belied by the detailed progress notes; **3**) a progress note stating that she performs unspecified activities of daily living with unspecified frequency and with unspecified duration and that she "takes care of grandson"; **4**) the alleged inconsistency between Plaintiff's self-reported sitting restrictions (30-40 consecutive minutes) and the restriction as reported by PA-C Hobbs (15 minutes); **5**) pain level zero out of ten noted under two PCP vitals checks despite prescribing plaintiff narcotic pain medications and listing acute pain as a chief complaint; and finally, **6**) alleged medication non-compliance substantiated solely by a notation that she "missed an appointment" for unspecified reasons and the provider "stressed compliance."

## VI.   Conclusion

For the reasons stated above, the recommendation is that the Court find that substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff was not disabled, that the matter be remanded to the agency for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g), and that the Clerk of Court be directed to enter judgment in favor of Plaintiff Patricia Gutierrez and against Defendant Kilolo Kijakazi, acting Commissioner of Social Security.

On remand, the recommendation is that the ALJ be instructed to re-evaluate the evidence in light of the functional opinions of Dr. Stoltz and PA-C Hobbs, with particular attention to the overlapping restrictions identified by the two clinicians (maximum lifting capacity of 10 pounds and occasional use of bilateral upper extremities for most tasks).  *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

## VII.   Objections Due within 14 Days

These Findings and Recommendations will be submitted to the United States District Judge

assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these Findings and Recommendations, any party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **December 3, 2023**                        **/s/ Gary S. Austin**
                                                    UNITED STATES MAGISTRATE JUDGE